# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| EMILE CESAIRE, | ) | Case No. 13-8205-WM |
| TOYE HAWKINS, and | ) | |
| CHRISTOPHER RONALD AIME, | ) | |
| | ) | |
| Defendant(s) | | |

FILED by _____ D.C.

APR 17 2013

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of ~~1/22/2013~~ 4/16/2013 in the county of Palm Beach in the
Southern District of Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 and 2312 | Conspiracy to transport stolen motor vehicles in interstate and foreign commerce |

This criminal complaint is based on these facts:
see attached affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Michael Degnan
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 17, 2013

*Judge's signature*

City and state: West Palm Beach, Florida     William Matthewman, U.S. Magistrate Judge
*Printed name and title*

## Affidavit in Support of Criminal Complaint

I, Special Agent Michael Degnan, being duly sworn, depose and state as follows:

1) I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for twenty-one years. I have been personally involved in the investigation of this matter. I am fully aware of the facts and circumstances set forth below based on my personal observations, recordings I have reviewed, and conversations I have had with others, including other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not attempted to include all the facts I learned in connection with this investigation. Where I have reported the contents of documents or the actions or statements of others, I have reported those matters in substance and in part, except as otherwise indicated.

2) In or about February 2013, I initiated an investigation of Emile Cesaire and Toye Hawkins, the defendants, regarding their alleged criminal activities including allegations that Cesaire and Hawkins were participants in the receipt and sale of luxury vehicles which were being stolen from out-of state automobile dealerships and re-sold in Florida.

3) On March 8, 2013, Cesaire and Hawkins, the defendants, met with two FBI undercover employees (hereinafter referred to as UC1 and UC2) at an office located in Palm Beach County, Florida. A concealed audio/video recording device was used to record this meeting. In this meeting, UC1 and UC2 represented themselves as auto brokers who purchased and sold automobiles.

4) During the meeting on March 8, 2013, Cesaire and Hawkins, the defendants, represented that they had access to stolen luxury vehicles. In particular, Cesaire stated that whatever car UC1 and UC2 wanted, they could get the car for them. Cesaire further explained that the cars come from outside the State of Florida and that their people take it off the lot. Hawkins provided additional detail that their contact takes the cars from up north, has the car sit in Atlanta for a couple of days and then moves it to Florida. Hawkins told UC1 and UC2 that the cars include Porches, Bentleys or whatever luxury vehicle they needed. Hawkins provided an example that their contact goes to Mercedes Benz in Connecticut and test drives a car worth $125,000. Hawkins said that after the test drive is completed, the guy swaps the key out, leaving a dummy key behind. Cesaire then stated that the guy comes back later and gets the car. Cesaire stated that if the vehicle has a tracking device, it is cut off the car.

5) After receiving the explanation of how the stolen vehicles were acquired, UC1 and UC2 expressed an interest in purchasing these vehicles. UC1 asked Cesaire and Hawkins, the defendants, the purchase price of these vehicles. Cesaire and Hawkins stated the price typically ranged between $4,000 and $7,000 per vehicle.

6) UC1 and UC2 told Cesaire and Hawkins, the defendants, that after UC1 and UC2 received these vehicles, the vehicles would be hidden in a container amongst other merchandise and shipped out of the country. UC2 stated the vehicle would be shipped through Finland. UC2 stated that they couldn't declare the car on the container and Hawkins replied, no you can't, at all.

7) UC1 asked Cesaire and Hawkins, the defendants, how the cars would be delivered to UC1 and UC2. In response, Hawkins pointed to Cesaire and stated that UC1 and UC2 will only deal with Cesaire and Hawkins and one of them would deliver the cars.

8) UC1 provided Cesaire and Hawkins, the defendants, a coded method of communication by which they would notify UC1 at a future date when a stolen vehicle was available for sale. In particular, UC1 requested an email indicating Cesaire or Hawkins was interested in purchasing a vehicle. In this regard, Cesaire stated that the amount listed on the email as the down payment would be the price of the car that Cesaire and Hawkins were selling to UC1 and UC2.

9) On March 21, 2013, Cesaire and Hawkins, the defendants, had a second meeting with UC1 and UC2 at an office in Palm Beach County, Florida. In this meeting, Hawkins stated that his contact was working on acquiring some vehicles and that his contact was expected to obtain a Mercedes and a Range Rover in the upcoming week. Hawkins stated he would email pictures of the vehicle to UC1. UC1 then provided Hawkins an email address to send the pictures. Hawkins told UC1 that he would send UC1 a text message to check your email.

10) During the meeting on March 21, 2013, Hawkins, the defendant, referred to other stolen vehicles in which the vehicle identification number (VIN) was changed on the vehicles. In response, UC2 stated he didn't want to change the VIN number because if Customs opened and weighed the container, they would just find a stolen vehicle that someone was trying to ship out of the country.

11) On April 10, 2013, UC1 received a text message from Hawkins, the defendant, stating he was ready for that car and would send an email to UC1. Later that same day, UC1 received an email from lil305621@yahoo.com which stated, "This is the car I want you to find for me". Attached to this email were four pictures of a Range Rover.

12) On April 11, 2013, UC1 contacted Hawkins, the defendant, and participated in a recorded telephone conversation with Hawkins. During this call, UC1 told Hawkins that the vehicle had a wholesale value of approximately $61,000 but that the value could fluctuate based on the additional features the vehicle possessed. UC1 asked Hawkins to send UC1 the VIN for the vehicle so that UC1 could provide Hawkins an accurate assessment of the vehicle's value. Following this conversation, UC1 received a text message from Hawkins with a photograph of VIN number SALMF1E43BA350276.

13) On April 11, 2013, an FBI data operator conducted a query of VIN number SALMF1E43BA350276 through the National Crime Information Center (NCIC) database. This query determined that the Range Rover was stolen from an auto dealership in West Palm Beach, Florida on April 10, 2013.

14) On April 12, 2013, UC1 participated in a recorded telephone conversation with Hawkins, the defendant. During this call, UC1 and Hawkins agreed on a purchase price of $6,000 for the vehicle. Hawkins also agreed to deliver the vehicle to UC1 on April 16, 2013.

15) On April 13, 2013, UC1 and Hawkins, the defendant, exchanged text messages in which they agreed to raise the purchase price of the vehicle to $6,500.

16) On April 15, 2013, $8,500 in evidence purchase funds was obtained from the FBI by UC2. These funds were subsequently provided to UC1 to utilize in a pre-arranged meeting with the defendants, Cesaire and Hawkins.

17) On April 16, 2013, at approximately 9:38 a.m., an FBI surveillance team observed a burgundy Ford F-250 pick-up truck at the stop light located at Lake Worth Road and Turnpike Road, turning west bound on Lake Worth Road. The FBI surveillance team observed two black males in the Ford F-250, one wearing a white shirt and the other wearing a white shirt with stripes. The FBI surveillance team observed a silver Range Rover traveling behind the Ford F-250. The FBI surveillance team observed a black male, large build wearing a black shirt and gray hat driving the silver Range Rover. The FBI surveillance team observed both the burgundy Ford F-250 and the silver Range Rover continue westbound and enter an office complex. A few minutes later, the FBI surveillance team observed the black male, previously observed driving the silver Range Rover, walking eastbound on Lake Worth Road towards the BP gas station wearing a black shirt, black shorts and a gray hat.

18) On April 16, 2013, at approximately 9:41 a.m., Cesaire and Hawkins, the defendants, were observed by the FBI surveillance team exiting the burgundy F-250 with a child. The FBI surveillance team observed Ontario tags on the Ford F-250. The FBI surveillance team observed Cesaire, Hawkins and the child enter the office building where they met with UC1 and UC2. During this meeting, Cesaire and Hawkins delivered the Range Rover with the above VIN number to UC1 and UC2. UC1 paid Cesaire $6,500 for the Range Rover. UC1 paid for the Range Rover with the evidence funds previously provided to UC1.

19) On April 16, 2013, at approximately 10:25 a.m., Cesaire and Hawkins, the defendants, were arrested by FBI Agents in the parking lot of the office complex where they met with UC1 and UC2. In a search incident to this arrest, Cesaire was found to be in possession of $8,500 in currency.

20) On April 16, 2013, at approximately 10:30 a.m., the driver of the silver Range Rover, further identified as Christopher Aime, the defendant, was detained. At approximately 11:46 a.m., Aime was advised of his Miranda Rights and waived his right to counsel. Aime admitted that he was the driver of the silver Range Rover delivered to UC1 and UC2 by Cesaire and Hawkins, the defendants, and admitted to knowing that the vehicle was stolen. Aime stated that a friend of his, Toye Hawkins, had connections with guys who were going to purchase the Range Rover and then ship the Range Rover "overseas". Aime admitted to knowing that the stolen vehicle was being shipped overseas but was not able to recall the name of the country where the vehicle was being shipped.

21) Aime, the defendant, admitted visiting the Range Rover dealership located in West Palm Beach, Florida. Aime stated that he went to the dealership with a black female named Chiante Last Name Unknown (LNU) and a friend of hers, a Jamaican male who goes by Jonathan LNU. Aime, Chiante, and Jonathan LNU went into the dealership and dealt with a car salesman. Aime told the car

salesman that he (Aime) was looking at used cars and had $25,000 to put down on the vehicle. The car salesman showed Aime a silver Range Rover. After viewing the vehicle, Aime observed the car salesman placing the key to the silver Range Rover in a desk drawer in the car salesman's office. Aime then distracted the salesman and went into the desk drawer to remove the key for the silver Range Rover. Aime took the key from the car salesman's desk drawer and replaced it with a similar looking key Aime had brought with him. Shortly thereafter, Aime, Chiante, and Jonathan LNU exited the dealership, and Aime had the key to the silver Range Rover with him. Aime stated that he later provided the key to Hawkins, the defendant, who would then be responsible to have someone steal the silver Range Rover off the dealer's lot. Aime stated the reason he came to Palm Beach County was because car dealerships in Broward and Dade Counties were on to this scheme.

Michael Degnan
Special Agent, FBI

Sworn to and Subscribed before me this 17th day of April, 2013.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 13-8205-WM

UNITED STATES OF AMERICA

vs.

EMILE CESAIRE,
TOYE HAWKINS, and
CHRISTOPHER RONALD AIME,

      Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes   __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes   __X__ No

                        Respectfully submitted,

                        WIFREDO A. FERRER
                        UNITED STATES ATTORNEY

BY:  /s/ Marc Osborne
                        Marc Osborne
                        Assistant United States Attorney
                        Court ID# A5500796
                        500 S. Australian Avenue, Suite 400
                        West Palm Beach, Florida 33401
                        Tel: (561) 209-1014
                        marc.osborne@usdoj.gov